PETER G. MUNRO *vs.* THE PRESIDENT, DIRECTORS AND COMPANY OF THE MERCHANTS' BANK & others.

A bill of sale of an undivided share of a vessel, absolute in form, to one who is named therein simply as trustee, without expressing the nature of the trust, but with an oral understanding that it is given as security for debts due and to become due from the vendor to a third party, with authority in the trustee, in case of default in the payment of any of said debts, to sell the share and apply the proceeds towards the payment thereof, rendering the surplus, if any, to the vendor, leaves no equity of redemption in the vendor. And if, on the return of the vessel from a whaling voyage on which she was engaged at the time of the execution of the bill of sale, a proportionate share of her catchings is set apart and afterwards sold for the trustee and *cestui que trust,* and the proceeds accounted for and afterwards applied so far as necessary by mutual agreement to pay for a proportionate share of the outfits for a new voyage, this is sufficient to show an agreement that a share of the catchings of the new voyage shall be held on the same trust with the share of the vessel, and the same may accordingly be sold by the trustee in the execution of his trust.

BILL IN EQUITY, brought by the administrator of the estate of Rogers L. Barstow, late of Mattapoisett, deceased, against the President, Directors and Company of the Merchants' Bank and others, to redeem a share of the whaling bark Clara Bell, and obtain an account of her catchings.

The following facts appeared by the bill and answers and an agreement of the parties:

On the 13th of October 1857 Barstow, being then the owner of one quarter part of the whaling bark Clara Bell, which was then at sea on a whaling voyage, and being then and until his death her managing owner and agent, executed the fol owing bill of sale:

" To all to whom these presents shall come, greeting: Know ye that I, Rogers L. Barstow of Mattapoisett, in the county of Plymouth and state of Massachusetts, owner of the bark or vessel called the Clara Bell, now at sea on a whaling voyage, of the burthen of two hundred and ninety-five tons, or thereabouts, for and in consideration of the sum of seven thousand dollars, lawful money of the United States of America, to me in hand paid before the sealing and delivery of these presents by James B. Congdon, trustee, of New Bedford, county of Bristol and state aforesaid, the receipt whereof I do hereby acknowledge and am therewith fully satisfied, contented and paid, have bargained and sold, and by these presents do bargain and sell unto the said James B. Congdon, his executors, administrators and assigns, seven thirty-seconds of the said bark or vessel, together with seven thirty-seconds the masts, bowsprit, sails, boats, anchors, cables and all other necessaries thereunto belonging; as she sailed on her present voyage, the certificate of the registry of which said bark or vessel is as follows, to wit:" [Here followed a copy of the certificate, and full covenants of warranty by Barstow to Congdon, but with no mention of any *cestui que trust* or description of the nature of the trust. The bill of sale was under seal.]

The Clara Bell returned from her voyage on the 4th of May 1858, and sailed upon a new voyage on the 24th of the following June, from which she returned with large catchings on the 9th of November 1864. Barstow died in July 1860, and the plaintiff was duly appointed administrator of his estate. On the 19th of January 1861, Congdon, after a prohibition from the plaintiff, sold to Abner H. Davis the seven thirty-seconds of the bark with her outfits and catchings, as she then was at sea, by public auction, for the sum of $5906.25. The auction was well attended, and Davis paid a fair price. He had been notified by the plaintiff that any title under the sale would be contested, but honestly believed that a good title could be made to him, in spite of the plaintiff's notice.

Francis H. Barstow, a clerk of Rogers L. Barstow from 1841 till his death in 1860, testified in behalf of the plaintiff that he

kept the books of the latter, and that all the accounts were kep as if the latter owned seven thirty-seconds of the Clara Bell that that proportion of the profits of the first voyage was cred-ited to him and received by him, and that proportion of the out-fits of both voyages was entered as paid by him; that he fitted her for her last voyage, and paid the bills from his general funds · and that no accounts were kept of any particular fund, or with the Merchants' Bank or Congdon. On cross-examination he testified that he had no personal knowledge of the transactions of Rogers L. Barstow with the Merchants' Bank, or of the con-veyance to Congdon, and kept the accounts of the Clara Bell precisely as if said Barstow had a perfect title to all the interest with which he was credited.

Charles R. Tucker, president of the Merchants' Bank, testi-fied in behalf of the defendants that in August or September 1857 Rogers L. Barstow called on him and said that it would be necessary for him to have increased accommodation at the bank, and desired to make an arrangement by conveying a part of two whaling vessels; that he was and should be owing sun-dry parties who would be willing to take his notes if they could get them discounted whenever they wanted the money, and he desired to place in the hands of the bank an amount which would be sufficient at all times to cover his liabilities to the bank, either as payer or indorser; that he said he would con-vey seven thirty-seconds of the Clara Bell, and one quarter or more of another vessel, both of which were then at sea, whal-ing; that, in reply to a question how the property was to be dis-posed of in case of default, he said, "Sell it the next day;" and that he conveyed to Congdon, the cashier, the respective por-tions of the vessels named, in trust. The witness further testi-fied that no paper or document was given to Barstow, showing his interest in the vessels; that notes bearing Barstow's name were afterwards discounted at the bank, in pursuance of the above arrangement; that on the arrival home of the Clara Bell in 1858 the part of the cargo belonging to the bank was desig-nated by the mark "M. B." in paint on the casks, and delivered to the witness: that Barstow also delivered to him an account

of the casks and the guages, and the witness went with Barstow and compared them and found them correct; that at this time, as nearly as the witness could remember, Barstow asked if he should sell this part of the cargo if he had an opportunity, to which the witness replied that he would see when the opportunity occurred; that afterwards an opportunity to sell occurred, and the witness told Barstow to sell, and this was accordingly done, and an account of the sale rendered to the witness for the bank; that when this account was rendered the vessel was on the eve of sailing on another voyage, and the witness requested Barstow to use the funds in paying a proportionate part of the outfits; that at about this time Barstow's liabilities to the bank were very much reduced, and the witness did not remember asking him, or his offering, to pay over the balance to the bank; that the security then held by the bank was in his judgment ample to meet Barstow's liabilities, without the payment of that balance; and that in January 1861 the amount of his liabilities to the bank was $5598.17.

The testimony of Congdon and of the teller of the bank was also taken, but is immaterial to be recited here.

The case was reserved by *Hoar*, J., for the determination of the whole court.

*T. D. Eliot & T. M. Stetson*, for the plaintiff. Barstow managed and controlled this vessel always. The transfer of a share of her in 1858 did not embrace her outfits or catchings. No possession was taken under this transfer, nor was Barstow ever in default to the bank during his life. In 1858 an additional pledge of oil was made to the bank, and with this Congdon had nothing to do. Barstow then equipped the vessel for a new voyage, paid all the bills, and was sending her to sea without interference from the bank or Congdon. Wishing to sell his oil, including that in which the bank was collaterally interested, he negotiated, informed Tucker, who assented, and then he sold the oil and received the money. Tucker requested him to use the proceeds in paying a proportionate share of the outfits. But the outfits were already on board, and had been paid for from Barstow's general funds. Tucker's request, therefore, was simply

a release to Barstow of his lien on the proceeds of that oil
The surplus was never mentioned by either party.    The vesse.
sailed again, with Barstow as owner in possession, management
and control.    No property of Barstow's became absolutely the
bank's by these transactions.

The bank never became interested in the catchings of the
last voyage.    These catchings were not in existence at the time
of the transactions ; they were in the nature of freight, and
freight belongs to those who earn it.    See *Langton* v. *Horton*,
5 Beav. 9; *Hoskins* v. *Pickersgill*, Marsh. Ins. (4th ed.) 568;
*Philips* v. *Ledley*, 1 Wash. C. C. 226 ; *Webb* v. *Peirce*, 1 Curtis
C. C. 104; *Blanchard* v. *Fearing*, 4 Allen, 118; *Howard* v. *Odell*,
1 Allen, 85; *Manter* v. *Holmes*, 10 Met. 402 ; *Milton* v. *Mosher*,
7 Met. 248.    The question is, who was the whaling merchant
who engaged in the whaling business and employed this prop-
erty ? for his are the catchings.    3 Kent Com. (6th ed.) 138.

Even if the bank had the title, the sale was illegal and void.
The title had not been conveyed by the bill of sale.    The oil,
therefore, was only pledged.    The sale of pledges is regulated
by statute.    Gen. Sts. *c.* 151, § 9.

The sale of the ship was unlawful.    The language of Bar-
stow, to " sell the next day," must be understood reasonably.
The mode of extinguishing an equity of redemption must be
just and reasonable.    *Wilson* v. *Little*, 2 Comst. 443.    2 Kent
Com. 583.    This agreement was unreasonable.    It is harsh to
sell such property, under such circumstances, at all.    There is
no mode of ascertaining the value.

*J. C. Stone*, ( *W. W. Crapo* with him,) for the defendants.
The conveyance from Barstow to Congdon was a trust, and the
performance of its terms could have been enforced in equity
*Cooper* v. *Whitney*, 3 Hill, 95.    *Baker* v. *Thrasher*, 4 Denio, 495
It was not the intention of the parties to make a mortgage.    If
it had been, the conveyance would have been made directly to the
bank.    This form was adopted with reference to the earnings of
the vessel, and to avoid all questions as to the right to the earn-
ings of subsequent voyages.    See *Lindsay* v. *Gibbs*, 22 Beav. 528.
And the setting apart of a share of the catchings is conclusive on

this point. And it is of little practical importance whether the conveyance was a deed of trust or a mortgage. The outfits and catchings would be included in either. See *Milton* v. *Mosher*, 7 Met. 248; *Moody* v. *Wright*, 13 Met. 17; *Mitchell* v. *Winslow*, 2 Story R. 630. Catchings of whale-ships are not such after acquired property as most of the reported cases relate to; but rather the increase or proceeds of property already possessed, and incident to it. See *Rowley* v. *Rice*, 11 Met. 336; *Moody* v. *Wright*, 13 Met. 17; *Chesley* v. *Josselyn*, 7 Gray, 490.

BIGELOW, C. J. The bill in this case seems to have been framed and the argument in behalf of the plaintiff has proceeded on an entire misapprehension of the nature of the transaction between the plaintiff's intestate and the Merchants' Bank, in relation to the conveyance of the title of the former to a certain portion of the bark Clara Bell. It is obvious on the face of the transaction that it was not the intention of the parties that a mortgage interest or title should be created in the vendee under the bill of sale of the vessel. This, we think, is manifest on an inspection of the document, without resorting to parol evidence. Not only is the conveyance absolute in form, but it is made to a third person. An essential feature of a mortgage or pledge of personal estate is, that the title or possession is vested in or held by the person to whom the debt is due which the property is intended to secure. If the intention of the parties had been to attach to the conveyance of the vessel the incidents of a mortgage, the bill of sale would have been made directly to the bank, the creditor of the intestate. The bank was competent to take a conveyance in mortgage as security for debts due from the intestate, and, as such a mode of transfer is among. the common and ordinary transactions of business, the inference is very strong that the parties adopted another form of security *e x industria*.

What the real nature of the transaction was, is indicated in part by the bill of sale. It is made to Congdon, who at the time was cashier of the bank, in his individual capacity, as trustee." This shows that the vendee held it on some trust or confidence, and not for his own use and benefit; but neither the

nature of the trust nor the name of the person or corporation who were to be entitled to the beneficial interest in the property is set forth in the instrument. These appear, however, satisfactorily from the parol evidence; especially from the testimony of Mr. Tucker, the president of the bank, which stands wholly uncontradicted. The substance of his statement is, that the plaintiff's intestate made the bill of sale to Congdon in trust, to be held by him as security for any debts which might be due to the bank from the intestate, either as promisor or indorser, with power and authority, in case of any default in the payment of any debt which might become due to the bank from him, to sell the vessel without any delay. In this state of the evidence we are unable to see any plausible ground on which the plaintiff can assert or maintain the rights of a mortgagor or pledger in his intestate, as to the share of the vessel which was included in the bill of sale.

But it is urged in his behalf that, although he may not be entitled to redeem the vessel, he is nevertheless warranted in requiring an account from the defendants of the share or proportion of the outfits of the vessel which was conveyed and held in trust, and of the catchings of the voyage on which the vessel sailed, and in the pursuit of which she was engaged at the time of the death of his intestate. If this part of the plaintiff's claims was to be determined entirely by the bill of sale executed by his intestate and the parol agreement originally entered into by which the trust was created between him and the vendee, it would be open to serious question whether the outfits and catchings were comprehended within the terms of the trust. But there is other evidence in the case, which has an important and decisive bearing on the rights of the parties to this portion of the property in controversy. It appears from the evidence that, after the arrival of the bark from the voyage on which she was bound when the bill of sale was executed, the proportion or part of the catchings of the voyage which belonged to the share of the vessel which had been transferred to a trustee as security for the debts due from the intestate to the bank was set apart and marked by him as being also appropriated as additional security

for the same debts, and that an account of the casks and of the guages thereof was delivered to the bank; that these catchings were afterwards sold with the assent of the bank and the trustee; and that the proceeds of these sales, after being accounted for by the intestate to the bank, were by express agreement used to pay the proportionate part of the outfits for a new voyage of that part of the bark which was held in trust. Taking this new agreement in connection with the previous transfer of the vessel, we think the inference is unavoidable that the parties intended that the intestate's proportion of the catchings which replaced the original outfits should be held on the same trust as that which had been agreed upon in regard to his share of the vessel, and when these were subsequently reinvested by the assent of both parties in the outfits of a new voyage to be again replaced by catchings, they were still held subject to the trust, so that on the arrival of the vessel in the home port from the second voyage the catchings passed into the hands of the ship's husband as agent for the trustee, and thence into the hands of the defendants, to be applied towards the payment of the debts due from the intestate to the bank.

The result of this view of the transactions between the parties is, that the plaintiff cannot maintain his bill for a redemption of the intestate's share of the vessel, nor for an account of the proceeds of the catchings, on the ground that they did not vest in the trustee and had been wrongfully applied by him and the bank in payment of the debts due to the latter. The transfer of the vessel and the catchings was made on a trust in the nature of a mortgage. The transaction was analogous to that class of conveyances of real estate where deeds are made to secure debts, but, instead of being to the creditors, third persons are named as grantees, who take the estate on a trust, declared and set forth in the deed, and which, by accepting, they become bound to execute and fulfil. Such a conveyance, it has been held, does not vest a mortgage title or interest in the grantee, nor does it leave in the grantor an equity of redemption in the sense in which that phrase is understood as applied to mortgages. It has been determined that if a deed is made on a trust to pay a

debt, to be executed by a third person and not the creditor, it is a conveyance on a pure trust. In regard to grants of this nature the tendency of courts is to hold that no title remains in the grantor which can be taken on execution, and that the trustee may pass an absolute title to a grantee on complying with the terms of the trust, without any right in the grantor to redeem the same. The nature of these conveyances and their legal incidents are well stated in 1 Washburn on Real Prop. 502, where the authorities are fully collected. If this is the doctrine applicable to conveyances of real estate in trust to pay debts, *a fortiori* it is applicable to similar conveyances of personal property.

It appears in the case at bar that the vessel and catchings were disposed of by a sale, and the proceeds applied in strict conformity to the trust on which they were held, after due notice to the plaintiff. There is, therefore, no ground for maintaining his bill. The plaintiff has a complete and adequate remedy at law to recover the balance of money belonging to the estate of his intestate, which the bank, as agent of the trustee, has offered and has always been ready to pay to the plaintiff.

*Bill dismissed.*